**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 23-4711**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BISHEEM JONES, a/k/a Bosh,

Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Frank W. Volk, Chief District Judge.  (5:22-cr-00046-1)

─────────────

Argued:  December 11, 2025                                        Decided:  July 21, 2026

─────────────

Before GREGORY, QUATTLEBAUM, and BERNER, Circuit Judges.

─────────────

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Berner wrote the opinion, in which Judge Gregory joined. Judge Quattlebaum wrote a dissenting opinion.

─────────────

**ARGUED:**  Jenny R. Thoma, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Bridgeport, West Virginia, for Appellant.  Lesley S. Shamblin, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Brian D. Yost, HOLROYD & YOST, Charleston, West Virginia, for Appellant.  William S. Thompson, United States Attorney, William E. Longwell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

─────────────

BERNER, Circuit Judge:

This case arises out of a gun trafficking ring involving more than one hundred and thirty firearms, two states, and nearly twenty participants. Following a trial, a jury convicted one of the leaders of this ring, Bisheem Jones, of numerous criminal offenses. Among the convictions, Jones was found guilty of conspiracy to commit promotional money laundering.

While money laundering is commonly thought of as the disguising of ill-gotten gains so that they appear to have come from a legitimate source, the federal crime of "promotional money laundering" is something different altogether. It is the funneling of money obtained through an illicit business back into that same business. Jones was convicted of conspiring to commit this crime. On appeal, Jones challenges the sufficiency of the evidence to support this conspiracy conviction. He also challenges the district court's application of several Sentencing Guidelines enhancements. For the reasons that follow, we vacate Jones's conviction for conspiracy to commit promotional money laundering and remand for resentencing. We affirm the district court's application of the challenged Guidelines enhancements.

I.    Background

When reviewing an appeal of a criminal conviction, we view the evidence presented at trial in the light most favorable to the prosecution. *United States v. Umeti*, 167 F.4th 687, 694 (4th Cir. 2026).

2

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) identified Megan Bickford as having purchased in West Virginia a large number of firearms of the same make, model, and caliber over a short period of time. Such repeated purchases are known by law enforcement to be a common sign of gun trafficking. Some of the firearms Bickford purchased were later recovered at crime scenes hundreds of miles away in the Commonwealth of Pennsylvania.

Following this trail of evidence, the ATF uncovered an expansive straw-purchasing scheme. A straw purchase occurs when an individual who is legally permitted to buy a firearm purchases it on behalf of someone else. The purchaser certifies that she is legally permitted to own a firearm and that she is purchasing the firearm for her own use, when in fact she intends to transfer the firearm to another individual, generally for a profit. Firearms straw purchased in states with more lenient gun laws are often transported and resold in states with stricter gun laws. West Virginia is known as a state where straw purchasing commonly occurs because firearms are readily available and relatively easy to purchase.

The straw-purchasing scheme at issue involved Bickford and her husband, Brandon Lawson. The scheme began when Lawson purchased a firearm in West Virginia and sold it to Derrick Woodard who then took it back to his home state of Pennsylvania. After Woodard told his friend Bisheem Jones about the purchase, Jones approached Lawson to ask whether he would be interested in purchasing more firearms in West Virginia for him. Lawson agreed and so the scheme began.

The scheme functioned like this. Jones instructed straw purchasers in West Virginia to purchase certain firearms. Jones then sent money to the straw purchasers via a payment

3

application or wire transfer. In addition to paying the cost of the firearm itself, Jones compensated the purchasers—with money, drugs, or both—for their efforts. Jones and his co-conspirators then resold the firearms in Pennsylvania. The purchasers could expect to be paid between fifty and four hundred dollars in exchange for each firearm.

The scheme was profitable. A firearm purchased in West Virginia for approximately four hundred dollars could be resold in Pennsylvania for over triple that amount. Over time, the number of participants in the scheme grew. At its peak, the scheme involved nearly two dozen individuals between the straw purchasers in West Virginia and sellers in Pennsylvania.

Jones played a key role in directing the operation. He recruited participants, organized firearm purchases, compensated the straw purchasers, and participated in the subsequent resale of the firearms in Pennsylvania. All told, at least nineteen people were involved, one hundred and thirty-four firearms were purchased in West Virginia, and over one-third of the straw-purchased firearms were later recovered by law enforcement in Pennsylvania.

A federal grand jury in the Southern District of West Virginia charged Jones with four counts: conspiracy to travel interstate with the intent to deal in firearms without a license, pursuant to 18 U.S.C. § 371; conspiracy to commit promotional money laundering, pursuant to 18 U.S.C. § 1956(h); aiding and abetting interstate travel with the intent to deal in firearms without a license, pursuant to 18 U.S.C. §§ 922(a)(1)(A) and 924(n); and being a felon in possession of a firearm, pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(2). After a five-day jury trial, the jury convicted Jones on the first three counts, including conspiracy

4

to commit promotional money laundering. Jones was acquitted on the final count, being a felon in possession of a firearm.

At trial, ten of Jones's alleged co-conspirators testified about how the straw-purchasing scheme worked. Several testified specifically about Jones's leadership role. After the Government rested, Jones moved for judgment of acquittal on all counts. *See* Fed. R. Crim. P. 29. With respect to the count of conspiracy to commit promotional money laundering, Jones argued that the Government had not proffered any evidence of an agreement to launder money, a necessary element of the offense. He asserted that the Government's evidence focused solely on the conspiracy to commit gun trafficking. The district court denied Jones's motion. After trial, Jones renewed his motion for judgment of acquittal, which the district court again denied.

At sentencing, the district court applied several enhancements pursuant to Sentencing Guideline Section 2K2.1, including a four-level enhancement for an offense involving a firearm with an altered or obliterated serial number, an eight-level enhancement for a conviction involving over one hundred firearms, and a four-level enhancement for trafficking in firearms.[1] The district court sentenced Jones to a total of three hundred months—or twenty-five years—in prison.

---

[1] The district court also applied a four-level enhancement for Jones's role as a leader in the scheme, pursuant to Sentencing Guideline Section 3B1.1(a). Jones does not challenge the application of this enhancement.

## II.    Analysis

Jones timely appealed. He challenges both his conviction for conspiracy to commit promotional money laundering and his sentence.[2] This court has jurisdiction to review Jones's appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We address each of his challenges in turn.

### A.    Conspiracy to Commit Promotional Money Laundering

On appeal, Jones renews the argument he made in his motion for judgment of acquittal. He contends that there was insufficient evidence to support his conviction of conspiracy to commit promotional money laundering. Specifically, Jones argues that the Government failed to produce evidence that there was an agreement between himself and another individual to funnel proceeds obtained from the straw-purchasing scheme back into the illicit business.

We agree with Jones. The Government's evidence, at most, proved the existence of a gun-trafficking business and Jones's role in running that unlawful business with other participants. At trial, the Government's evidence of promotional money laundering focused almost exclusively on Jones's conversations and transactions with the West Virginia straw purchasers. Yet the Government explicitly claims that only the Pennsylvania sellers participated in the promotional money laundering conspiracy. The evidence presented at

---

[2] Jones does not challenge his convictions for conspiracy to travel interstate with the intent to deal in firearms without a license and for aiding and abetting interstate travel with the intent to deal in firearms without a license.

trial was not sufficient to prove that Jones and another participant in Pennsylvania shared a separate agreement to use unlawful proceeds to promote further gun trafficking. Accordingly, we vacate Jones's conviction for conspiracy to commit promotional money laundering and remand with instructions to enter a judgment of acquittal on that count.

This court reviews *de novo* a district court's denial of a motion for judgment of acquittal. *Umeti*, 167 F.4th at 697–700. We consider whether the prosecution put forward sufficient evidence to support Jones's conviction when viewed "in the light most favorable to the prosecution, assuming its credibility, and drawing all favorable inferences from it[.]" *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011) (emphasis omitted); *see also Umeti*, 167 F.4th at 694. A defendant challenging the sufficiency of the evidence "bears a 'heavy burden' to overturn his conviction." *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024) (quoting *United States v. Clarke*, 843 F.3d 288, 297 (4th Cir. 2016)). We will affirm the jury's verdict if a rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v Everett*, 91 F.4th 698, 712 (4th Cir. 2024) ("Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." (internal citation and quotation marks omitted)).

To establish that a defendant engaged in a conspiracy to commit promotional money laundering, the prosecution must prove beyond a reasonable doubt that there was an agreement between Jones and one or more persons to engage in promotional money laundering among other elements. *United States v. Singh*, 518 F.3d 236, 248 (4th Cir.

7

2008). That agreement need not be formal or express. It may be tacit and proved by circumstantial evidence. The evidence must, however, be sufficient evidence from which a reasonable jury could find that Jones and another participant shared the objective of using unlawful proceeds from the gun-trafficking scheme to promote further gun trafficking.

Jones was convicted of engaging in a conspiracy to commit promotional money laundering. It is helpful first to understand the underlying crime. Promotional money laundering occurs when the defendant conducted or attempted to conduct a financial transaction that he knew involved the proceeds of a specified unlawful activity (in this case, gun trafficking) with the intent to carry on that activity. *United States v. Cloud*, 680 F.3d 396, 403 (4th Cir. 2012) (citing 18 U.S.C. § 1956(a)(1)). This crime, read broadly, could encompass any illicit business. The distinction between operating an unlawful enterprise and using its proceeds to promote future unlawful activity is a fine one, as many transactions that facilitate the day-to-day operations of an unlawful enterprise also involve the expenditure of criminal proceeds. This court has cautioned, however, that the "statute should not be interpreted to make [every illegal] transaction a money laundering crime." *United States v. Heaps*, 39 F.3d 479, 486 (4th Cir. 1994), *abrogated on other grounds by United States v. Cabrales*, 524 U.S. 1, 6 (1998)). When proving a conspiracy to engage in promotional money laundering, the Government must prove more than an agreement to partake in unlawful business operations. It must also prove that the defendant and another participant agreed to use proceeds from the unlawful business to promote its further operation.

8

Take the example of an unlawful gambling ring. *United States v. Santos*, 553 U.S. 507, 509 (2008). To operate such a ring, the participants necessarily agree to engage in a number of transactions to compensate individuals who help to run the ring and pay winners. *Id.* Those payments are part of the agreed-upon mechanics of the underlying enterprise itself, not evidence of a separate agreement among participants to reinvest or funnel proceeds for the purposes of promoting further gambling activity. *Id.* Crucial here, while payments compensating straw purchasers for buying firearms may complete the transactions that constitute the unlawful activity, they reflect the "consummation" of the underlying offense rather than the use of the proceeds to reinvest in, expand, or promote the gun trafficking enterprise. *Heaps*, 39 F.3d at 485.

This distinction matters because the Government cannot rely on the same agreement to buy and resell firearms to prove a separate agreement to launder the proceeds of those sales with the aim of promoting the business. If the payment for services rendered as part of an illicit business constituted "a transaction that promoted the unlawful activity of that same transaction, virtually every sale of [illicit materials] would be an automatic money laundering violation as soon as money changed hand[s]." *Id.* What distinguishes promotional money laundering from the underlying criminal activity—in this case, gun trafficking—is the funneling of unlawfully obtained proceeds back into an illicit business. *Id.* at 486. The question is not whether the Government proved that Jones and others agreed to traffic firearms. It plainly did. Instead, the question is whether the Government presented evidence from which a reasonable jury could conclude beyond a reasonable doubt that

9

there was an agreement between Jones and at least one other individual to funnel proceeds from the completed firearm sales back into the scheme to promote further gun trafficking.[3]

The Government describes the conspiracy to commit promotional money laundering as one involving Jones and the sellers in Pennsylvania, including Woodard. Although several of these sellers were called as witnesses for the Government, a reasonable jury could not conclude that this testimony presented evidence beyond a reasonable doubt that Jones and the sellers agreed to funnel their profits back into the scheme.

In an effort to overcome this evidentiary deficiency, the Government points to a series of text messages exchanged between Jones and Woodard. In these messages, Woodard repeatedly asks Jones to give him money from the proceeds of the gun sales in order to pay for food and other personal bills. The two never discuss using those proceeds to fund additional purchases, however. What those text messages show is a dispute over how to divide the proceeds for personal use, not an agreement to reinvest the proceeds back into the firearm trafficking business. As we have stated, evidence of an agreement to traffic

---

[3] Following the Supreme Court's decision in *Santos*, the money laundering statute was amended to clarify what can constitute "proceeds," including kickback payments. Fraud Enforcement and Regulatory Act of 2009, Pub. L. No. 111-21, § 1956(c)(1). Contrary to the assertion of the dissent, we do not hold that payments made to compensate members of a criminal enterprise cannot be promotional money laundering. Dis. Op. at 22. Under the statute, such payments plainly can. *Id.*

This amendment did not, however, eliminate the animating concerns of *Heaps* and *Santos* in the promotional money laundering context. Under the approach urged by our dissenting colleague, any evidence of ongoing participation in an illegal business would automatically constitute sufficient evidence of a conspiracy to commit promotional money laundering. On the facts before us, this attenuated inference does not constitute sufficient evidence of an agreement between Jones and the Pennsylvania participants to commit promotional money laundering.

in firearms is not, by itself, evidence of an agreement to engage in promotional money laundering. Evidence of an agreement to divide proceeds of a crime, with nothing more, cannot serve as proof of a conspiracy to commit promotional money laundering. Rather, as we have stated, the prosecution must show that there was an agreement to use those proceeds to promote the illicit business.

The Government also argues that evidence of Jones's electronic money transfers to straw purchasers in West Virginia to pay for firearms was sufficient to support the money laundering conspiracy conviction. We disagree. The Government's theory at trial was based on two separate conspiracies. These electronic money transfers were between Jones and the straw purchasers in West Virginia. Yet the Government's position was that the West Virginia straw purchasers were *not* part of the alleged money laundering conspiracy. *See* Oral Argument at 26:09; 30:05.

Finally, the Government cites evidence of cash deposits into Jones's bank account in amounts that exceeded sixty-five thousand dollars during the period of the straw-purchasing scheme. According to the Government, these deposits are circumstantial evidence that Jones funneled illicit proceeds from the straw-purchasing scheme back into the scheme, particularly because Jones admitted that he had no lawful source of income during this time. Even assuming the deposits support an inference that Jones personally used proceeds from firearm sales to fund further purchases, they do not show that he and any other participant agreed to use the proceeds in that manner.

As we have emphasized, the Government must prove that there was an agreement between co-conspirators. Neither the text messages between Jones and Woodard nor the

11

electronic cash transfers nor the deposits into Jones's bank account—standing alone or together—provide sufficient evidence of an agreement between Jones and a single co-conspirator.[4]

Because the Government failed to present sufficient evidence from which a reasonable jury could conclude that Jones and a co-conspirator agreed to funnel proceeds to promote further gun trafficking, we vacate Jones's conviction for conspiracy to commit promotional money laundering and remand with instructions to enter a judgment of acquittal on that count and to resentence Jones on the remaining counts.[5]

---

[4] The dissent relies on our standard of review to support its contention that Jones's conviction should be affirmed. Though highly deferential, the standard of review here is not toothless. We do not merely look to see if there is "some evidence" or "any evidence" in the record. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). "[A] substantive constitutional standard [beyond a reasonable doubt] . . . require[s] that the factfinder . . .rationally apply that standard to the facts." *Id.* at 317. To be sure, we need not be "convinced of guilt beyond a reasonable doubt[.]" *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). But neither is the prosecution excused from presenting evidence at trial from which a "rational trier of fact" could so find. *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010). We are unable to conclude that this standard has been met.

[5] Having concluded that Jones's conviction for conspiracy to commit promotional money laundering must be vacated, we need not address Jones's argument that his indictment on this count was defective. Furthermore, because we remand for resentencing, we also do not address Jones's argument that his sentence was substantively unreasonable.

12

B.  <u>Sentencing Enhancements</u>

Though we vacate Jones's conviction for conspiracy to commit promotional money laundering, his convictions for the other crimes remain. Thus, we turn to his challenges to the district court's application of several Sentencing Guideline enhancements.[6]

Where the application of a Sentencing Guideline enhancement is primarily a factual determination, this court reviews the district court's judgment under the deferential clear error standard. *United States v. Ellis*, 130 F.4th 442, 447 (4th Cir. 2025). Typically, this court will reverse only if "left with the definite and firm conviction that a mistake has been committed." *United States v. Savage*, 885 F.3d 212, 225 (4th Cir. 2018) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). Jones challenges the application of three sentencing enhancements.[7] We address each in turn.

### i.      *Obliterated Serial Number*

Upon finding that the trafficking scheme involved firearms with obliterated serial numbers, the district court applied a four-level enhancement pursuant to Sentencing Guideline Section 2K2.1(b)(4)(B) (Obliterated Serial Number Enhancement). The district court based its finding on two photographs of firearms recovered by law enforcement and testimonial evidence. The district court stated that it had "some difficulty in identifying at

---

[6] Jones was sentenced under the 2018 Sentencing Guidelines.

[7] Initially, Jones also challenged the district court's base offense level calculation, arguing that two of his prior convictions did not qualify as predicate offenses for purposes of this calculation. In *United States v. Suncar*, which was decided after this case was fully briefed but before oral argument, this court interpreted the statutes at issue in Jones's prior convictions and determined that the offenses qualify as predicate offenses. 142 F.4th 259, 266 (4th Cir. 2025). The district court thus correctly calculated Jones's base offense level.

13

least one of the serial numbers." Parties' Joint Appendix (J.A.) 1140. At the time of Jones's sentencing, this court interpreted the relevant Sentencing Guideline provision to cover circumstances where the serial number was not completely obliterated, but also where the number was simply "less legible." *United States v. Harris*, 720 F.3d 499, 503–04 (4th Cir. 2013). The district court properly followed this then-binding precedent in applying the Obliterated Serial Number Enhancement.

Prior to 2024, the federal circuit courts of appeals were of differing views regarding whether this Guideline enhancement applied to less-than-legible serial numbers that were not completely obliterated. *Compare Harris*, 720 F.3d at 503–04 (holding that "less legible" serial numbers counted for purposes of the guideline enhancement) *with United States v. St. Hilaire*, 960 F.3d 61, 66 (2d Cir. 2020) (holding that the enhancement applies only to "illegible" serial numbers). In 2024, the Sentencing Guidelines were amended. The revisions resolved that circuit split, clarifying that the enhancement should apply only where the serial number is "illegible or unrecognizable to the unaided eye." Sentencing Guidelines § 2K2.1(b)(4)(B) (2024). *Harris*, therefore, no longer governs individuals sentenced under the current Guidelines. *See, e.g.*, *United States v. Capers*, 61 F.3d 1100, 1112–13 (4th Cir. 1995) (recognizing that an amendment to the Guidelines commentary requires "us to scrap our earlier interpretation of that guideline"); *see also United States v. Vasquez-Cruz*, 692 F.3d 1001, 1006 (9th Cir. 2012) ("Of course, a change in the language of an applicable Guidelines provision, including a change in application notes or commentary, supersedes prior decisions applying earlier versions of that provision, just as we would be bound to apply the updated version of an agency rule or regulation."). The

14

Sentencing Commission did not make this change retroactive, and thus it only applies to individuals sentenced following this change.

The district court, however, on remand may exercise its "discretion to consider nonretroactive Guidelines changes[.]" *Concepcion v. United States*, 597 U.S. 481, 486 (2022) ("[W]hen a defendant's sentence is set aside on appeal, the district court at resentencing can (and in many cases, must) consider the defendant's conduct and changes in the Federal Sentencing Guidelines since the original sentencing." (citing *Pepper v. United States*, 562 U.S. 476, 492 (2011)).[8]

### ii.    Gun Trafficking Enhancement

Jones also challenges the application of a four-level enhancement for trafficking in firearms pursuant to Sentencing Guideline Section 2K2.1(b)(5) (Trafficking Enhancement). The Trafficking Enhancement applies where a defendant "transported, transferred, or otherwise disposed of two or more firearms to another individual." U.S.S.G. § 2K2.1(b)(5) (2018). Jones argued at sentencing, as he does on appeal, that the Trafficking Enhancement can only be applied when a defendant sold *multiple* firearms to *one* individual, not when a defendant made separate sales of single firearms to different individuals. Two of our sister circuits have adopted Jones's interpretation. *See, e.g.*, *United*

---

[8] During the pendency of this appeal, the Supreme Court issued its decision in *Rutherford v. United States*, 608 U.S. -- (2026), which held that a sentencing disparity created by a nonretroactive change in the Sentencing Guidelines cannot constitute an extraordinary and compelling reason to merit consideration for relief under the First Step Act. The Supreme Court explicitly noted that its decision "is not to the contrary" of *Concepcion*. *Id.* at *9. Furthermore, Jones is directly appealing his sentence, not seeking relief under the First Step Act.

15

*States v. Henry*, 819 F.3d 856, 871–72 (6th Cir. 2016) (holding that the Trafficking Enhancement applies only if two or more firearms were sold to a single recipient); *United States v. Daniells*, 79 F.4th 57, 91–92 (1st Cir. 2023) (same).

Here, the district court found that Jones sold multiple firearms to a single individual as part of the same transaction. Because this finding was not clearly erroneous, we leave the question of the proper interpretation of the Trafficking Enhancement for another day, and we affirm the district court's application of the Trafficking Enhancement.

### iii.    Number of Firearms

Finally, Jones challenges the district court's application of Sentencing Guideline Section 2K2.1(b)(1)(D), which imposes an eight-level enhancement when the convicted crimes involve more than one hundred firearms. Jones argued at sentencing and maintains on appeal that the crimes for which he was convicted related only to a small subset of the firearms involved in the overall scheme. The Government presented evidence that over one hundred firearms were straw purchased in West Virginia as part of the scheme and that Jones led the scheme, including directing purchases. *See United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999); U.S.S.G. § 1B1.3 (2018). This is sufficient evidence to support application of the Guideline. The district court therefore did not clearly err in applying the eight-level enhancement.

### III.    Conclusion

For the reasons set forth above, we vacate Jones's conviction for conspiracy to commit promotional money laundering and remand with instructions to enter a judgment

16

of acquittal on that count and to resentence Jones on the remaining counts. Jones's convictions for conspiracy to travel interstate with the intent to deal in firearms without a license and for aiding and abetting interstate travel with the intent to deal in firearms without a license are affirmed.

AFFIRMED IN PART,
VACATED IN PART, AND
REMANDED WITH INSTRUCTIONS

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Jones' challenges to the district court's application of three Sentencing Guidelines enhancements should be rejected. But in my view, the majority misapplies Supreme Court and Fourth Circuit precedent in concluding that insufficient evidence supports Jones' conviction for conspiracy to commit promotional money laundering.

As to that count, the majority rightly states that "[t]o establish that a defendant engaged in a conspiracy to commit promotional money laundering, the prosecution must prove beyond a reasonable doubt that there was an agreement between Jones and one or more person to engage in promotional money laundering." Maj. Op. at 9. But I disagree with the majority's conclusion that under our deferential standard of review, no reasonable jury could have found that such an agreement existed. *See Bufkin v. Collins*, 604 U.S. 369, 386 (2025) (describing sufficiency-of-evidence review as applying a "hypothetical, objective standard" that "put[s] a thumb on the scale in favor of the prevailing party—the prosecution"); *United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012) (noting that we "will sustain the jury verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" and must "remain cognizant that it is the jury's province to weigh the credibility of the witnesses, and to resolve any conflicts in the evidence" (quoting *United States v. Penniegraft*, 641 F.3d 566, 571–72 (4th Cir. 2011))). In my view, the jury heard sufficient evidence to reach that conclusion.

Derrick Woodard testified at trial that he repeatedly traveled with Jones to West Virginia to illegally buy guns to resell in Pennsylvania. At one point, Woodard sent Jones

18

a text message accusing Jones of "finessing" Woodard and also saying that "if [Jones] wasn't gonna give [Woodard] no bread, [Jones] should have just let [Woodard] grab b ratchets instead of telling" Woodard that Jones "was gonna give [Woodard] 3K letting [Jones] buy all of them." J.A. 365. The government asked Woodard about this message:

> Q. Can you explain to the jury, what were you saying in this text message to Mr. Jones? Why -- what did you mean by the you were supposed to give me $3,000? What was that $3,000 for?
>
> A. Umm, for letting him buy the firearms that we was supposed to get in West Virginia.
>
> Q. And why didn't he give you that $3,000?
>
> A. Say that again.
>
> Q. Why didn't he give you that $3,000?
>
> A. I'm not sure.
>
> Q. Was that your cut of the -- that was supposed to be your cut for the firearms you obtained in West Virginia?
>
> A. Yeah, something like that.
>
> Q. What do you mean by "something like that"?
>
> A. Umm, I was supposed to buy a portion of them, but I didn't, he bought all of them. He say he was going to give me some money for letting him buy them.
>
> Q. And when you refer to ratchets here, what are you referring to?
>
> A. It's firearms.

J.A. 365–66. And Jones' response to Woodard's text confirms that this was the substance of their agreement:

> Q. Go ahead and read what Mr. Jones texted you back on that date and time.

19

> A. Say, "What do I have to finesse anybody for, bro? . . . [Y]ea, I was gonna give you 3K, but the profit was only something small. . . ."

> Q. Mr. Woodard, that portion where he text[ed] you I was going to give you 3,000 but the profit was only something small, what profit? Was he referring to, profit off what?

> A. Off the firearms that he sold.

J.A. 366–67. This exchange between Jones and Woodard demonstrates that Jones and Woodard had an agreement—rather than each of them buying and selling some of the guns, Jones would do all of the buying and selling. But since that meant Woodard wouldn't receive any proceeds directly from selling guns, Jones would pay Woodard a cut. A reasonable jury could have inferred that Woodard understood this cut would come from Jones' illegal firearms sales. Woodard affirmed at trial that he understood the promised payoff to be "[his] cut" from the sales, Jones said afterward that "the profit" from the sales hadn't been enough to cover the payoff and Woodard testified that he wasn't aware of Jones having ever held a job. J.A. 366–67. The jury could certainly have inferred that Jones knew where that money was coming from and that he knowingly and voluntarily entered this agreement.[1]

The majority acknowledges that the evidence shows Woodard and Jones discussed Jones paying Woodard from his firearms-sales profits. But it nonetheless concludes that a

---

[1] Unlike conspiracies prosecuted under the general criminal conspiracy statute, 18 U.S.C. § 371, conspiracies to commit money laundering charged under 18 U.S.C. § 1956(h) don't require an overt act in furtherance of the conspiracy. *Whitfield v. United States*, 543 U.S. 209, 214 (2005). So, it's immaterial that Jones didn't ultimately give Woodard the money he promised him.

reasonable jury couldn't have convicted Jones of conspiracy to commit promotional money laundering. To reach this conclusion, the majority primarily relies on two cases—*United States v. Santos*, 553 U.S. 507 (2008) (plurality opinion), and *United States v. Heaps*, 39 F.3d 479 (4th Cir. 1994), *abrogated on other grounds by United States v. Cabrales*, 524 U.S. 1 (1998).

*Santos* was about the meaning of the term "proceeds" in the money laundering statute. There, the Supreme Court affirmed the vacatur of a promotional money laundering conviction. 553 U.S. at 524 (plurality opinion). The defendant had been part of an illegal lottery scheme and had used the revenue to "pay the salaries of [others in the scheme] and to pay the winners." *Id.* at 509. A plurality determined that although "[t]he federal money-laundering statute [did] not define 'proceeds,'" that term must refer to profits, not gross receipts (that is, total revenues). *Id.* at 511, 514. It determined that the term was genuinely ambiguous and, finding that "the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition," adopted it consistent with the rule of lenity. *Id.* at 514. The plurality also noted that interpreting "proceeds" to include gross receipts would mean that "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery" and "few lotteries, if any, will not pay their winners." *Id.* at 515–16. Concurring in the judgment, Justice Stevens said that "proceeds" might mean different things for different unlawful activities but agreed with the plurality that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is

21

not 'proceeds' within the meaning of the money laundering statute." *Id.* at 525, 528 (Stevens, J., concurring in the judgment). Although the Supreme Court did not reach a majority opinion in *Santos*, we have since interpreted that case as holding that "'proceeds' means 'net profits' when the proceeds are from an illegal gambling operation" because "if 'proceeds' were defined to mean 'gross receipts,' any crime involving costs would automatically become money laundering when the money received from the crime was used to pay expenses." *United States v. Halstead*, 634 F.3d 270, 278 (4th Cir. 2011).[2]

My colleagues in the majority say that after *Santos*, payments made to compensate members of a criminal enterprise "are part of the agreed-upon mechanics of the underlying enterprise itself, not evidence of a separate agreement among participants to reinvest or funnel proceeds for the purposes of promoting further" criminal activity. Maj. Op. at 10. But *Santos* interpreted a now-outdated version of the money laundering statute. When the Court decided that case, the money laundering statute didn't define "proceeds." *Santos*, 553 US. at 511 (plurality opinion). A year later, Congress amended the statute to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, *including the gross receipts of such activity*." Fraud Enforcement and Regulatory Act of 2009, Pub. L. No. 111–21, § 2(f)(1), 123 Stat. 1617, 1618 (codified at 18 U.S.C. § 1956(c)(1)) (emphasis added). By doing so, Congress "effectively overrul[ed] *Santos*'s conclusion." *United States v. Booker*, 146 F.4th 332, 344 (4th Cir. 2025) (citing *United States v. Abdulwahab*, 715 F.3d 521, 531 n.8 (4th Cir. 2013));

---

[2] If there is no majority opinion, the holding is the opinion "concur[ring] in the judgment[] on the narrowest grounds." *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976).

22

*see United States v. Cloud*, 680 F.3d 396, 406, 409 & n.6 (4th Cir. 2012) (overturning a promotional money laundering conviction based on pre-amendment conduct where the defendant made "payments to . . . coconspirators for the role each person played in [a] mortgage fraud scheme" but acknowledging that, after amendment, the issue was "not likely to arise in many more cases"). Because all of the conduct in this case took place after the amendment, the government didn't have to prove that Jones promised to pay Woodard from the profits of the firearms-sales scheme—Jones promising to pay Woodard from the revenues of the scheme could be promotional money laundering, too.

That leaves *Heaps*, which was about what counted as promotion under the money-laundering statute. *See* 39 F.3d at 484–86. There, we vacated a promotional money laundering conspiracy conviction for insufficient evidence. *Id.* at 487. The defendant sold ecstasy to dealers, the dealers sold the ecstasy to consumers and the dealers then repaid the defendant "from the profits of the ecstasy sales." *Id.* at 481. We determined that the defendant did not promote unlawful activity simply by receiving that money. *Id.* at 485–86. We said that "[w]ere the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction[,] virtually *every* sale of drugs would be an automatic money laundering violation as soon as money changed hands," and the money laundering statute would thus "criminalize the very same conduct already criminalized by the drug laws." *Id.* at 485–86. So, the majority says, "[e]vidence of an agreement to divide proceeds of a crime, with nothing more, cannot serve as proof of a conspiracy to commit promotional money laundering." Maj. Op. at 12.

23

I agree with the majority that two criminals agreeing to split the proceeds of their scheme isn't automatically a conspiracy to commit promotional money laundering. The agreement needs to benefit an ongoing enterprise as opposed to simply settling a one-time debt. *See Heaps*, 39 F.3d at 484 (noting that there, "the payment was merely to satisfy the debt of a completed and, as far as the record shows, the final transaction").[3] But we have sufficient evidence of that here.

Woodard testified that Jones frequently paid him. And Woodard traveled with Jones to buy and resell firearms on multiple occasions. The second time Woodard did so was after Jones promised Woodard a cut of Jones' sales from the previous trip. That makes this case less like *Heaps* and more like cases after *Heaps* in which we have found adequate evidence of promotional money laundering. For example, in *United States v. Singh*, we pointed out that *Heaps* involved "a one time payment on an antecedent debt" with no evidence that it was made "to create goodwill for subsequent drug transactions." 518 F.3d 236, 248 (4th Cir. 2008). In contrast, we explained that in *Singh*, a defendant was paid with funds derived from a prostitution scheme for providing the motel rooms used for the

---

[3] The majority claims that under my view of promotional money laundering, "any evidence of ongoing participation in an illegal business would automatically constitute sufficient evidence of a conspiracy to commit promotional money laundering." Maj. Op. at 11 n.3. That's not correct. As I've explained, the government must prove that the parties to the conspiracy agreed to use the proceeds of illegal activity to promote that illegal activity. Without such an agreement, ongoing participation in an illegal business is not a conspiracy to commit promotional money laundering. And in my view, as I have explained, there is sufficient evidence from which a reasonable jury could have found this requirement met.

24

scheme that went on "for more than two years." *Id*. That, we said, was sufficient evidence of an intent to benefit an ongoing scheme. *Id*.

Likewise, in *United States v. Bolden*, we found that payments made to a member of the scheme from the scheme's proceeds "compensated [that member] for his part in the scheme, *encouraging his continued participation therein*," constituted promotional money laundering. 325 F.3d 471, 489 (4th Cir. 2003) (emphasis added). A reasonable jury could infer from Woodard's testimony that, like the agreements in *Singh* and *Bolden*, Jones and Woodard's agreement was meant to benefit the firearms-sales scheme by encouraging Woodard's continued participation. *See generally United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010) ("[C]ourts have often relied on proof that the defendant was aware of the inner workings of and/or extensively involved in the drug organization responsible for the criminal activity as circumstantial proof that he had the specific intent to promote its unlawful purpose."). That's not to say a jury could not make other reasonable inferences from this evidence; instead, our question is whether one possible reasonable inference is that Jones agreed to pay Woodard to keep Woodard involved in the scheme. *See Bufkin*, 604 U.S at 386. If so, we're required to draw that inference. Since I believe we are, I would affirm the jury's verdict on the promotion money laundering conspiracy count.

25